## C. HOWARD HUNT PEN CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10437.   Promulgated February 20, 1928.

*Kenneth N. Parkinson, Esq.*, for the petitioner.
*L. C. Mitchell, Esq.*, for the respondent.

902

LOVE: Petitioner seeks to increase its invested capital by including therein $76,000, alleged to represent the value of patents, trademarks, and secret processes acquired for capital stock issued at the time of its organization in 1901. The first limitation prescribed by the Revenue Act upon the inclusion in invested capital of intangible property paid in for stock is that the amount shall not exceed "the actual cash value of such property at the time paid in." Revenue Act of 1918, section 236 (a) (4). The petitioner must establish such value. It is shown that it acquired about ten trade-marks for pens, and a patent for a box for holding pens. It is further shown that the predecessor corporation imported special machinery from England and brought over some expert workmen and that it developed its own processes of manufacture. What the processes were or in what respect they were peculiarly valuable, does not appear. We apprehend that no intangible value attached to the machinery and workmen that can be identified and appraised. It does appear that the petitioner was the first company to make round-point pens, but it is not shown that they were covered by patents or that petitioner had a monopoly therein.

In exchange for all the property of the predecessor corporation petitioner gave $1,000 in cash and $199,000 par value of its capital stock to C. Howard Hunt, who had purchased it at the receiver's sale for $69,000. Most of this stock was distributed by him among twenty-eight other individuals. What he received for it is not disclosed, so that there is no evidence of the value of the stock based on sales which may be used as a criterion of the value of the property transferred. The petitioner's counsel argues that the stock was sold by Hunt to the other individuals at par, but the record does not bear him out in this. There was general testimony to the effect that petitioner never issued any stock except at the par value thereof, but the only evidence of particular sales of stock by petitioner relates to $1,000 of stock issued to the three incorporators and the $199,000 of stock issued to Hunt.

The predecessor corporation operated at a loss. During the first two years of petitioner's existence there were large losses, in the third and fourth years there were small gains, in the fifth year a small loss. Petitioner undertook to attribute this poor showing to lack of attention to the sales department and poor management of an executive officer, who resigned in the latter part of 1901, or early in 1902. But this explanation does not help us to determine the value of the intangible property. The secretary of the petitioner testified that, along about 1904 or 1905, he offered to pay the company the book value " of their buildings, machinery, stock, and everything else,

if they would give me the name." Just what this offer embraces is not clear, but it may be noted that at the time it was made the item of trade-marks, patents and processes had previously been charged off the books in the reduction of capital stock made in 1902. In a careful examination of the record, we can not find sufficient evidence from which we can determine that the patents, trade-marks and processes had a value when paid in to petitioner on June 28, 1901.

The next issue relates to petitioner's claim to have included in invested capital $223,584.84 spent between 1904 and 1915 for advertising, this sum previously having been charged to expense in the manner described in the findings.

The principle upon which such expenditures may be regarded as capital charges is that they resulted in the acquisition of an asset from which petitioner continued to derive benefits for a substantial period of time beyond the year in which they were made. If the advertising done in one year created a market which continued to exist over a long period of time, it quite obviously would be improper to charge the entire cost to that year. See *Colonial Ice Cream Co.* v. *Commissioner*, 7 B. T. A. 154; *Richmond Hosiery Mills* v. *Commissioner*, 6 B. T. A. 1247; *Appeal of Northwestern Yeast Co.*, 5 B. T. A. 232. In the present case, however, there is no proof that petitioner acquired anything in the way of a subsisting asset. All we have in evidence is the amount of money spent, testimony that the market was considered as not developed in 1904, and never has been fully developed, and statements of gain or loss which seem to bear no relation to the amounts spent for advertising. We may not presume that the mere expenditure of the money necessarily was productive of something of value to the petitioner. The respondent's disallowance of these expenditures in invested capital is, therefore, approved.

The remaining issue relates to the reduction of invested capital by the amount of income and profits taxes paid or accrued during the year on income of the preceding year or years. No evidence was offered by petitioner on this issue. The question raised, however, has already been decided adversely to the petitioner's position in *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

*Judgment will be entered for the respondent.*